IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Blaine L. Musgrove, Jr., | ) | C/A No.: 1:15-2275-JMC-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Disability Insurance Benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.    Relevant Background

A.    Procedural History

On November 5, 2013, Plaintiff filed an application for DIB in which he alleged his disability began on October 4, 2013. Tr. at 89, 180–86. His application was denied initially and upon reconsideration. Tr. at 112–15, 118–19. On October 2, 2014, Plaintiff

had a hearing before Administrative Law Judge ("ALJ") Edward T. Morriss. Tr. at 44–71 (Hr'g Tr.). The ALJ issued an unfavorable decision on January 12, 2015, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 20–43. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on June 4, 2015. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 43 years old at the time of the hearing. Tr. at 47. He completed high school. *Id.* His past relevant work ("PRW") was as a staffing office manager. Tr. at 67. He alleges he has been unable to work since October 4, 2013. Tr. at 52.

2.    Medical History

On April 29, 2011, Plaintiff underwent right total hip arthroplasty to treat avascular necrosis of the right femoral head. Tr. at 902. He was released to resume his regular activities on October 24, 2011. Tr. at 907.

Plaintiff visited C. Edward Weimer, Jr., M.D., FAAD ("Dr. Weimer"), for regular treatment of psoriasis with Humira injections in February 2012 and throughout the relevant period. Tr. at 321–39, 870–79, 935–939.

Plaintiff was admitted to Grand Strand Regional Medical Center on October 6, 2013, after falling approximately 25 feet from a deer stand. Tr. at 345–46. Treatment notes indicate Plaintiff's past medical history included hypertension, cirrhosis, significant

alcohol use, psoriasis, and right hip replacement. Tr. at 360, 361. Plaintiff's discharge diagnoses included right hip dislocation; left shoulder acromioclavicular ("AC") joint separation, type 3; respiratory failure, secondary to left lung contusion and atelectasis; left rib fractures 1–5, 9, and 11; electrolyte imbalance; hypertension; splenic laceration with splenectomy; T2 transverse process fracture; alcohol withdrawal; leukocytosis; transaminitis; anemia; elevated lipase; rhabdomyolysis; altered mental status; and cervicalgia. Tr. at 345. He was discharged on November 1, 2013, with instructions to follow up with Thomas J. Chambers, M.D. ("Dr. Chambers"), the trauma clinic, and his primary care physician. Tr. at 346. He was told to bear weight as tolerated with the right lower extremity, but to use right hip precautions. *Id.*

Plaintiff presented to Ben Davis, M.D. ("Dr. Davis"), on November 8, 2013. Tr. at 825. He reported pain in his left shoulder and bilateral feet. *Id.* Dr. Davis treated Plaintiff's foot ulcers with DuoDERM, refilled prescriptions for hypertension and anxiety medications, and prescribed Ambien for sleep and Oxycodone for pain. Tr. at 826.

Plaintiff followed up with Dr. Chambers on November 9, 2013, and reported pain in his left hip, shoulder, ribs, and foot. Tr. at 816–19. He complained of symptoms that included muscle aches and weakness, arthralgias, joint pain, back pain, numbness, dizziness, restless legs, depression, and sleep disturbance. Tr. at 817. Dr. Chambers observed that Plaintiff's upper extremity neurological exam was normal and that he demonstrated no restrictions in motion or guarding of his cervical spine or right shoulder. Tr. at 818. However, he noted that Plaintiff had some mild tenderness in his left trapezius region, over his left shoulder cuff, and in his ribs. *Id.* He indicated Plaintiff had redness,

warmth, and swelling about the left lateral midfoot and a superficial ulcer over the first metatarsal head. *Id.* Dr. Chambers assessed left ankle and foot joint pain, AC ligament sprain, left hip contusion, and acute gouty arthropathy. Tr. at 818–19. He recommended exercises for Plaintiff's shoulder, referred him to physical therapy, and prescribed Voltaren for his foot. Tr. at 819.

Plaintiff presented to James D. Reid, III, M.D. ("Dr. Reid"), on November 15, 2013. Tr. at 823. He reported discomfort in his bilateral feet while walking. *Id.* He also complained of left shoulder discomfort and sleep disturbance. *Id.* Dr. Reid noted some tenderness in Plaintiff's left shoulder and clavicle. *Id.* He refilled Oxycodone for pain and noted that Plaintiff seemed to be improving and had no limitation in his ability to walk. *Id.*

On December 13, 2013, Plaintiff reported some improvement in his left shoulder, but continued pain in his left hip. Tr. at 856. He complained of muscle aches and weakness, arthralgias, joint pain, back pain, weakness, dizziness, restless legs, depression, and sleep disturbance. *Id.* Dr. Chambers observed Plaintiff to be ambulating with a limp, but without an assistive device. Tr. at 857. He noted that Plaintiff had moderately restricted range of motion ("ROM") of his left hip, positive anterior hip impingement signs, positive Faber's test, and tenderness over the trochanter and anterior hip joint. *Id.* He indicated Plaintiff had mildly limited ROM over the right hip. *Id.* Plaintiff's AC joint showed trapezius tenderness and deformity, but his ROM and strength were nearly full. *Id.* Dr. Chambers assessed hip pain, gout, AC ligament sprain, hip contusion, and osteoarthritis of the pelvic region and thigh. *Id.* He indicated he

suspected Plaintiff's hip arthritis was related to his gout. *Id.* He stated Plaintiff "may be looking at hip replacement," but had no source for payment at that time. Tr. at 857–58.

State agency medical consultant Jean Smolka, M.D. ("Dr. Smolka"), completed a physical residual functional capacity ("RFC") assessment on January 3, 2014. Tr. at 81–84. She assessed Plaintiff's limitations as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; push and/or pull limited in right lower extremity; occasionally crouch; frequently reach overhead with the left upper extremity, climb ramps/stairs/ladders/ropes/scaffolds, stoop, balance, kneel, and crawl; and avoid concentrated exposure to extreme cold, extreme heat, humidity, fumes, odors, dusts, gases, poor ventilation, etc. *Id.*

Plaintiff presented to Douglas R. Ritz, Ph. D. ("Dr. Ritz"), for a consultative mental status examination on February 14, 2014. Tr. at 860–62. Plaintiff's sister attended the visit with him and reported to Dr. Ritz that he had been isolating from others and was having difficulty making decisions. Tr. at 860. Plaintiff reported disturbed sleep and vivid dreams since his accident. *Id.* He indicated he did well with one-on-one interaction, but had difficulty being in crowds. *Id.* Dr. Ritz observed Plaintiff to speak slowly and to pause for a long time before putting thoughts into words. Tr. at 862. He indicated Plaintiff's mood was irritable and anxious at times and that he had a flat affect. *Id.* He noted that Plaintiff had a mild tremor to his hands. *Id.* He observed Plaintiff to be coherent, logical, goal-directed, alert, responsive, and in mild distress. *Id.* Dr. Ritz

observed Plaintiff to be oriented to person, time, and place; to be able to remember two of three words after a brief delay; to perform serial sevens without error; to repeat a nine-word sentence; and to point to figures in a directed order. *Id.* He estimated that Plaintiff's cognitive skills were average and that his mental status was unimpaired. *Id.* He diagnosed post-traumatic stress disorder ("PTSD"). *Id.*

Plaintiff presented to Alfred Daniels, M.D. ("Dr. Daniels"), to establish primary care on February 27, 2014. Tr. at 885. A physical examination was abnormal for decreased left shoulder joint abduction to 90 degrees and decreased left hip flexion to 90 degrees. *Id.* Dr. Daniels assessed benign essential hypertension, localized primary osteoarthritis of the hip, and psoriasis. *Id.*

On March 3, 2014, state agency consultant Michael Neboschick, Ph. D. ("Dr. Neboschick"), reviewed the evidence and completed a psychiatric review technique form ("PRTF"). Tr. at 79–80. He considered Listing 12.06 for anxiety-related disorders and found that Plaintiff had mild restriction of activities of daily living ("ADLs"); moderate difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation. *Id.* Camilla Tezza, Ph. D. ("Dr. Tezza"), assessed identical restriction on May 2, 2014. Tr. at 97–98. Dr. Neboschick also completed a mental RFC assessment. Tr. at 84–85. He indicated Plaintiff had social interaction limitations and was moderately limited in his abilities to interact appropriately with the general public and to accept instructions and respond appropriately to criticism from supervisors. Tr. at 85. He found that Plaintiff was able to understand and carry out simple, routine tasks, as well as some complex tasks;

6

could persist at tasks for at least two-hour periods with the usual breaks; and did not require special supervision to complete tasks. *Id.* He stated Plaintiff may miss a day or two as a result of his psychiatric symptoms, but should generally be able to complete a normal workweek. *Id.* He indicated Plaintiff "would do best at uncrowded jobs that do not require extensive ongoing interaction with the general public, or predominantly having to work in groups with others to carry out tasks." *Id.* He found that Plaintiff was capable of avoiding hazards and adhering to normal safety and hygiene standards. *Id.* Dr. Tezza assessed the same mental RFC as Dr. Neboschick. Tr. at 102–03.

Dr. Daniels completed a physician's statement on April 2, 2014. Tr. at 908. He indicated Plaintiff's diagnoses included osteoarthritis of the left hip and chronic left shoulder dislocation. *Id.* He stated the findings that supported the diagnoses were pain and decreased ROM in the hip and left shoulder. *Id.* He stated Plaintiff was restricted from prolonged standing and lifting through October 2, 2014. *Id.*

On May 2, 2014, state agency medical consultant Mary Lang, M.D., found that Plaintiff was limited as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of two hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; occasionally push and pull with the bilateral lower extremities; occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl; never climb ladders/ropes/scaffolds; frequently reach overhead with the left upper extremity; and avoid concentrated exposure to extreme cold, extreme heat, humidity, fumes, odors, dusts, gases, poor ventilation, hazards, etc. Tr. at 99–102.

On June 16, 2014, magnetic resonance imaging ("MRI") of Plaintiff's spine showed severe left and mild right foraminal stenosis at C3-4 and a small ventral osteophyte and disc bulge with mild canal stenosis; a mild bulging annulus and mild bilateral foraminal stenosis at C4-5; a small left paracentral disc protrusion with mild chronic cord compression and moderate bilateral foraminal stenosis at C5-6; chronic cord compression due to a moderate broad-based disc protrusion and severe bilateral foraminal stenosis at C6-7; moderate left foraminal stenosis and a patent right foramen and canal at C7-T1; moderate bilateral foraminal stenosis and a broad-based bulging annulus and mild canal stenosis at T1-2; moderate bilateral foraminal stenosis and mild chronic cord compression due to a broad-based central disc protrusion at T2-3; and mild bilateral foraminal stenosis and a central disc protrusion with mild chronic cord compression at T3-4. Tr. at 910–11.

On July 15, 2014, Plaintiff presented to T. Scott Ellison, M.D. ("Dr. Ellison"), with a complaint of left occipitocervical pain to the left hand with numbness and tingling. Tr. at 953. Plaintiff indicated his pain worsened in March 2014 and was accompanied by sleep disturbance, swelling, numbness, tingling, and left arm weakness. *Id.* He stated his symptoms were exacerbated by sitting, bending, and twisting his neck. *Id.* Dr. Ellison observed Plaintiff to have tenderness to palpation, limited ROM of the neck and left shoulder, positive Spurling's sign, and diminished sensation to pinprick in the left hand and forearm. Tr. at 954. He assessed cervical radiculopathy, displacement of cervical intervertebral disc without myelopathy, cervicalgia, degeneration of cervical intervertebral disc, clavicle fracture, and history of splenectomy. Tr. at 954–55. He

indicated Plaintiff had severe cervical spondylosis that was worse at C5-6 and C6-7, but also notable at C4-5. Tr. at 955. He stated Plaintiff had elements of left C6 and C7 radiculopathies and that surgery may be indicated. *Id.* He also noted that Plaintiff appeared to have a disc herniation on the left at C5-6 and that it was difficult to know the primary source of Plaintiff's pain. *Id.*

On July 24, 2014, Plaintiff underwent a computed tomography ("CT") scan of his cervical spine. Tr. at 918–19. It revealed multilevel foraminal stenosis at C3-4, C4-5, C5-6, and C6-7 and degenerative facet joint changes at C2-3, C3-4, C4-5, C5-6, and C7-T1. Tr. at 918.

On August 7, 2014, Dr. Ellison indicated the MRI and CT scans showed severe spondylosis with significant facet joint arthrosis on the left at C3-4; spondylosis at C4-5, severe spondylosis at C5-6, with a probable left paracentral osteophyte disc complex; and severe spondylosis at C6-7, with clear osteophyte formation causing foraminal stenosis. Tr. at 956. He noted that Plaintiff's blood pressure was elevated and recommended he follow up with his primary care physician. *Id.* He discussed the possibility of surgery, but recommended Plaintiff first attempt physical therapy and pain management. Tr. at 957. He stated he would be hesitant to perform four-level anterior cervical discectomy and fusion ("ACDF") because it would likely result in significant stiffness. *Id.*

Plaintiff completed a neck disability index form on August 14, 2014, and reported that the intensity of his neck pain was the worst imaginable. Tr. at 925. He stated it was painful to look after his own personal care and that he was slow and careful *Id.* He indicated he could not lift or carry anything at all. *Id.* He stated he hardly read because of

severe pain in his neck. *Id.* He indicated he experienced moderate headaches on an infrequent basis. *Id.* Plaintiff reported he had a great deal of difficulty concentrating. Tr. at 926. He stated he could not do any work at all. *Id.* He indicated he could hardly drive because of his neck pain. *Id.* He assessed his sleep as "completely disturbed." *Id.* He stated he could not do any recreational activities. *Id.*

Plaintiff presented to NextStep Rehabilitation for a physical therapy evaluation on August 14, 2014. Tr. at 929. He complained of constant pain and stiffness in his neck that was worse on the left side. *Id.* Laura Nichole Bluemle, DPT ("Ms. Bluemle"), observed Plaintiff to ambulate with a slow, steady gait and to be able to perform transitional movements without assistance. *Id.* However, she noted that Plaintiff avoided cervical movement. *Id.* She observed Plaintiff to have a slight tremor in his hands that was worse in his bilateral thumbs. *Id.* Plaintiff demonstrated reduced ROM of his cervical spine and left shoulder. *Id.* He had 4/5 strength in his left upper extremity with increased neck pain. *Id.* He demonstrated reduced grip strength in his left hand. *Id.* He was tender to palpation in his upper trapezius, rhomboids, deltoids, cervical spine, and thoracic spine. *Id.* Ms. Bluemle indicated Plaintiff had a high level of subjective pain and was unable to tolerate any attempts at manual manipulation or therapeutic exercises. Tr. at 930.

On August 19, 2014, Dr. Ellison prescribed Plaintiff a home TENS unit for pain management. Tr. at 927.

Plaintiff was discharged from physical therapy on August 21, 2014. Tr. at 930. Ms. Bluemle indicated Plaintiff was a poor candidate for physical therapy. Tr. at 931. She

stated distraction was ineffective and that Plaintiff was unable to tolerate low-level postural exercises. *Id.*

On August 21, 2014, Plaintiff presented to Douglas Swartz, M.D. ("Dr. Swartz"), regarding hypertension. Tr. at 951. He reported pain in his neck and shoulder. *Id.* Dr. Swartz observed hypertonicity of Plaintiff's posterior neck with limited ROM. Tr. at 952. He also noted peripheral neuropathy. *Id.* He assessed moderate recurrent major depression, cervical radiculopathy at the C5 nerve root, and benign essential hypertension. *Id.*

Plaintiff followed up with Dr. Ellison on August 26, 2014, to discuss surgery. Tr. at 959. Dr. Ellison indicated Plaintiff had recently been evaluated by a pain management physician who did not feel that injections would help. *Id.* He observed Plaintiff to have give way weakness in his left biceps, triceps, and wrist extensor; diminished pinprick sensation in his left forearm and hand; depressed left brachioradialis and triceps reflexes; and left shoulder tenderness. Tr. at 960. He indicated he would schedule Plaintiff for ACDF at C4-5, C5-6, and C6-7, with possible C6 corpectomy. Tr. at 959–60. He noted that Plaintiff had foraminal stenosis at the C3-4 level. Tr. at 960. He indicated he did not generally recommend four-level ACDF surgery, but would consent to four-level surgery and make a final determination based on a review of the symptomatology and imaging studies. *Id.* He indicated he would schedule surgery for mid-September and instructed Plaintiff to discontinue anti-inflammatory medications and to skip his next dose of Humira. *Id.*

Plaintiff was admitted to Georgetown Memorial Hospital for surgery on September 17, 2014. Tr. at 962. Dr. Ellison performed the following procedures: arthrodesis of C3-4, C4-5, C5-6, and C6-7; vertebral body corpectomy at C6; decompression at C3-4, C4-5, C5-6, and C6-7; placement of anterior plate and screws at C3, C4, C5, C6, and C7; placement of polyetheretheketone ("PEEK") interbody devices at C3-4, C4-5, and C5 to C7; and local bone graft within each PEEK interbody device. *Id.* He indicated Plaintiff had severe cervical spondylosis at all levels, especially C5-6 and C6-7, with large deforming anterior osteophyte formation. Tr. at 963. He indicated that severe left foraminal stenosis at C3-4, C5-6, and C6-7 prompted foraminotomies on the left at those levels. *Id.* He elected to perform complete C6 corpectomy because of the compressive changes and osteophyte formation between C5-6 and C6-7. *Id.*

Plaintiff presented to Dr. Swartz on September 22, 2014, to have forms completed. Tr. at 950. He denied experiencing numbness in his hands or feet. *Id.* Dr. Swartz assessed moderate recurrent major depression and cervical radiculopathy at the C5 nerve root. Tr. at 951. He instructed Plaintiff to follow up in a month and completed several medical statements. Tr. at 940–47. He indicated the following positive findings with respect to Plaintiff's low back: limitation of motion of the spine; sensory or reflex loss; positive straight-leg raising test; need to change positions more than once every two hours; chronic nonradicular pain and weakness; and inability to ambulate effectively (e.g., inability to walk a block at a reasonable pace on rough or uneven surface, inability to walk enough to shop or bank, or inability to climb a few steps at a reasonable pace with the use of a single handrail). Tr. at 940–41. Dr. Swartz indicated that Plaintiff's pain was

severe. Tr. at 940. He found that Plaintiff could stand for 30 minutes at a time; sit for 60 minutes at a time; work for one hour per day; occasionally lift five pounds; and occasionally bend and stoop. *Id.* Dr. Swartz also considered Plaintiff's mental functioning and found him to have the following depressive symptoms: anhedonia or pervasive loss of interest in almost all activities; sleep disturbance; decreased energy; feelings of guilt or worthlessness; and difficulty concentrating or thinking. Tr. at 942. He determined that Plaintiff had moderate restriction of ADLs; moderate difficulty in maintaining social functioning; and deficiencies of concentration, persistence, or pace that resulted in frequent failure to complete tasks in a timely manner (in work settings or elsewhere). *Id.* He assessed Plaintiff to have moderate impairment in his abilities to work in coordination with and proximity to other workers without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically-based symptoms; to perform at a consistent pace without an unreasonable number and length of rest periods; and to interact appropriately with the general public. Tr. at 943. He stated Plaintiff's symptoms were related to chronic illness and pain. Tr. at 944. Dr. Swartz indicated Plaintiff was totally disabled from performing his previous occupation and any other occupation. Tr. at 946. He indicated Plaintiff could stand for one hour per day with breaks; could sit for two hours per day; could walk for two hours per day with breaks; and could not drive for work. *Id.* He stated Plaintiff's work capacity was for sedentary work and that Plaintiff could use his hands for repetitive movement. *Id.* He indicated Plaintiff was unable to reach over shoulder level with his bilateral upper extremities. *Id.*

On October 28, 2014, Dr. Ellison completed an opinion statement in which he suggested Plaintiff was unable to complete an eight-hour workday. Tr. at 970–71. He indicated Plaintiff was doing well at his six-week postoperative appointment. Tr. at 971.

C.    The Administrative Proceedings

   1.    The Administrative Hearing

      a.    Plaintiff's Testimony

At the hearing on October 2, 2014, Plaintiff testified he became unable to work following a hunting accident. Tr. at 52. He explained that he went hunting by himself on the morning of October 4, 2013. *Id.* He stated he fell asleep in the tree stand with his head propped on the gun rest and subsequently fell two stories to the ground. *Id.* He indicated he remained on the ground for a day-and-a-half before he was found. *Id.* He stated his injuries included multiple fractures, a dislocated hip, and a ruptured spleen. *Id.*

Plaintiff testified that he had lost approximately 30 pounds following his accident. Tr. at 48. He endorsed some numbness and reduced strength in his left hand. Tr. at 49. He stated he experienced pain in his left hip that was exacerbated by climbing stairs, walking, and sitting. Tr. at 50, 56. He indicated pain in his lower back was also exacerbated by walking and sitting. Tr. at 56. He testified he had psoriasis that affected his feet and elbows. Tr. at 51. He indicated his psoriasis worsened in mid-summer and mid-winter because of the temperature and humidity extremes. *Id.* He indicated he was unable to do any of his PRW because of numbness in his hands, loss of balance, difficulty climbing, and problems kneeling and bending. Tr. at 52. He endorsed symptoms of

anxiety. Tr. at 54. He stated his doctor prescribed a cane following his accident and that he still used it to ambulate on his bad days. *Id.*

Plaintiff testified he had required assistance with personal care since the accident. Tr. at 53. He indicated he needed help washing his back and shaving. *Id.* He stated his wife, sisters, and mother helped him. *Id.*

Plaintiff testified that he could sit on a cushioned surface for up to an hour and on a hard surface for 15 to 20 minutes at a time. Tr. at 54, 55–56. He stated he could stand without support for 15 to 20 minutes on a bad day and for 20 to 30 minutes on a good day. Tr. at 55. He indicated he could walk half a block without stopping to rest. Tr. at 56. He stated he could occasionally lift three to five pounds, but did not perform any frequent lifting. Tr. at 57. He indicated he had difficulty lifting his arms above his head. Tr. at 15.

Plaintiff testified he last worked in May 2012. Tr. at 50. He indicated he worked for the same staffing company for 14 years. *Id.*

Plaintiff testified that he had three or four bad days per week and did not leave his house on those days. Tr. at 54–55. He indicated he had difficulty sleeping because of his pain. Tr. at 56. He stated he took approximately 12 medications per day that caused drowsiness, stomach upset, and blistering in the sun. Tr. at 57. He indicated he typically took a nap after lunch that lasted for an hour-and-a-half to two hours. *Id.*

Plaintiff testified that he had a driver's license and drove short distances. Tr. at 49. He indicated he had a commercial driver's license in the past, but was unable complete the physical requirements to maintain it. *Id.* Plaintiff indicated he did few household chores and no outside chores. Tr. at 53. He testified that he had attended church in the

15

past, but had difficulty sitting on the hard benches for a long period and being around crowds. Tr. at 53–54. He stated he typically did not leave his home, but occasionally visited the store to buy groceries. 54–55. He indicated he unloaded the groceries with his wife's assistance. Tr. at 63. He stated he often read and watched television. *Id.*

Plaintiff stated his limitations had increased since the initial period following the accident. Tr. at 59. He indicated he had previously been able to turn his neck, but had been unable to do so since his recent surgery. Tr. at 60. He stated he had lost strength in his left arm and experienced more numbness in his right arm since March 2014. *Id.*

Plaintiff testified he had right hip replacement in 2010 or 2011. Tr. at 61–62. He indicated the surgery was generally successful and that his right hip had not worsened since the accident. Tr. at 62.

b.     Vocational Expert Testimony

Vocational Expert ("VE") Tonetta Watson-Coleman reviewed the record and testified at the hearing. Tr. at 66–71. The VE categorized Plaintiff's PRW as a staffing office manager, *Dictionary of Occupational Titles* ("*DOT*") number 169.167-034, which has a specific vocational preparation ("SVP") of seven and is sedentary. Tr. at 67. However, the VE noted that Plaintiff described his job duties as being consistent with light work. *Id.* The ALJ described a hypothetical individual of Plaintiff's vocational profile who was limited to light work; could stand and walk for only two hours during an eight-hour workday; could occasionally climb ramps and stairs, stoop, balance, kneel, crouch, and crawl; could not climb ladders; could only occasionally reach overhead with the left upper extremity; and should avoid cold, heat, humidity, and fumes. *Id.* The VE

16

testified that the hypothetical individual could perform Plaintiff's PRW as a staffing office manager, as the job was generally performed. *Id.* The ALJ asked the VE to further assume the individual would require unscheduled work breaks for an average of two hours during an eight-hour workday. Tr. at 68. He asked if the individual would still be able to complete Plaintiff's PRW. *Id.* The VE responded that and individual with such limitations would be unable to retain or maintain employment. *Id.*

Plaintiff's attorney asked the VE to assume the hypothetical individual could sit, stand, and walk for only five hours in an eight-hour workday. *Id.* He asked if the individual could perform any jobs. *Id.* The VE responded that the individual would be unable to retain or maintain employment. *Id.*

Plaintiff's attorney asked the VE to assume the individual was able to lift only five pounds occasionally and no weight frequently. Tr. at 69. He asked if such a limitation would significantly compromise the sedentary occupational base. *Id.* The VE testified that it would. *Id.*

Plaintiff's attorney asked the VE to assume that an individual with the limitations set forth in the ALJ's first hypothetical would have deficiencies in concentration, persistence, or pace that would result in a frequent failure to complete tasks in a timely manner. *Id.* He asked if that limitation would eliminate all jobs in the national economy. *Id.* The VE testified that the individual would be unable to retain or maintain employment. *Id.*

The ALJ asked the VE to assume the individual with the limitations set forth in the first hypothetical would be limited to work that required no ongoing public interaction.

*Id.* He asked if the individual would still be able to do Plaintiff's PRW. *Id.* The VE responded that he would not. *Id.* The ALJ asked if there would be other jobs at the light exertional level that the individual could perform. *Id.* The VE responded that there would be no light jobs. Tr. at 70. The ALJ asked the VE if there would be jobs at the sedentary level that an individual with those limitations could perform. *Id.* The VE identified sedentary jobs with an SVP of two as an addresser, *DOT* number 209.587-010, with 500 positions in South Carolina and 96,330 positions in the national economy; a document preparer, *DOT* number 249.587-018, with 35,620 positions in South Carolina and 2,828,140 position in the national economy; and a table worker, *DOT* number 739.687-182, with 8,750 positions in South Carolina and 434,170 positions in the national economy. *Id.*

> 2. The ALJ's Findings

In his decision dated January 12, 2015, the ALJ made the following findings of fact and conclusions of law:

1. Claimant meets the insured status requirements of the Social Security Act through December 31, 2017.
2. Claimant has not engaged in substantial gainful activity since October 4, 2013, the alleged onset date (20 CFR 404.1571 *et seq.*).
3. Claimant has the following severe impairments: degenerative joint disease of the right hip status-post total hip replacement; left hip degenerative joint disease versus gouty arthropathy; history of left shoulder AC separation type III; degenerative disc disease of the cervical spine; psoriasis; and anxiety/post-traumatic stress syndrome (PTSD) (20 CFR 404.1520(c)).
4. Claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
5. After careful consideration of the entire record, I find that claimant has the residual functional capacity to perform less than the full range of light work

as defined in 20 CFR 404.1567(b). Specifically, claimant can lift and carry up to 20 pounds occasionally and 10 pounds frequently. He can sit for six hours in an eight-hour day, but can stand and walk for only 2 hours in an 8-hour day. Claimant occasionally can climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. He cannot climb ladders. He occasionally can reach overhead with his left upper extremity. Claimant must avoid concentrated cold, heat, humidity, and fumes. He is precluded from performing work which involves ongoing public interaction.

6. Claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. Claimant was born on December 19, 1970 and was 42 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563).

8. Claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that claimant is "not disabled," whether or not claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. Claimant has not been under a disability, as defined in the Social Security Act, from October 4, 2013, through the date of this decision (20 CFR 404.1520(g)).

Tr. at 25–37.

II. Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1) the Appeals Council failed to remand the case to the ALJ for consideration of new evidence;

2) the ALJ did not consider the entire record in assessing his RFC;

3) the ALJ failed to properly evaluate his treating physician's opinion; and

4) the ALJ mischaracterized the record and failed to consider his work history in assessing his credibility.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.      Legal Framework

1.      The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[1] (4) whether such

---

[1] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To

impairment prevents claimant from performing PRW;[2] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant

---

meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[2] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2. The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–

58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is

substantial evidence to support the decision of the Commissioner, that decision must be

affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483

F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    New Evidence

Plaintiff submitted records from the following medical visits to the Appeals

Council:

On October 1, 2014, Plaintiff followed up with Dr. Ellison for a wound check. Tr.

at 974. He reported his left arm was stronger and that he was doing well. *Id.* Dr. Ellison

referred Plaintiff to physical therapy and instructed him to follow up in four weeks. *Id.*

On October 28, 2014, Plaintiff reported 50 percent improvement to Dr. Ellison. Tr.

at 977. He rated his pain as moderate and indicated it occurred on an intermittent basis.

*Id.* He reported he was regaining the strength in his left arm and his numbness and

tingling were improving. Tr. at 979. Dr. Ellison indicated Plaintiff's blood pressure was

elevated and recommended he follow up with his primary care physician or an urgent

care facility. *Id.* He observed that Plaintiff's plate, graft, and screws looked appropriate

and that he had excellent lordosis. *Id.* He recommended Plaintiff continue with physical

therapy and resume activities as tolerated. Tr. at 980. He indicated Plaintiff should follow

up again around March 2015. *Id.*

On January 2, 2015, Plaintiff presented to Daniel J. Single, M.D. ("Dr. Single"),

regarding left hip pain. Tr. at 981. He reported left hip discomfort since 2013 and

described pain in his groin that he rated as a 10 out of 10. *Id.* He described the pain as achy most of the time, but occasionally sharp and stabbing. *Id.* He stated the pain woke him from sleep. *Id.* He endorsed additional symptoms that included numbness, tingling, and weakness. *Id.* Dr. Single observed Plaintiff to walk with antalgia on the left side. *Id.* Plaintiff had some mild tenderness and reduced strength in his left hip and endorsed pain with ROM. Tr. at 982. Dr. Single indicated he suspected Plaintiff had inflammatory arthritis in his left hip. Tr. at 983.

On February 13, 2014, Plaintiff reported three to four weeks of excellent pain relief following an intra-articular injection. Tr. at 972. Dr. Single observed Plaintiff to walk with some mild antalgia on the left side. *Id.* He referred Plaintiff for an MRI of his left hip and instructed him to follow up after the MRI. *Id.*

On February 23, 2015, an MRI of Plaintiff's left hip showed findings consistent with avascular necrosis of the left femoral head with greater than 50 percent involvement. [ECF No. 20-1 at 1]. Although the MRI indicated no subchondral collapse, it showed "at least moderately advanced degenerative arthrosis of the left hip." *Id.*

Plaintiff argues the Appeals Council erred in failing to remand the case for the ALJ to consider the new evidence summarized above. [ECF No. 20 at 17]. He maintains that the evidence related to the period on or before the ALJ's decision and was not duplicative or cumulative. *Id.* at 19. He contends that the ALJ denied his claim for benefits based on an evidentiary gap and that the evidence he submitted to the Appeals Council filled that gap. *Id.* at 21.

The Commissioner argues the evidence submitted to the Appeals Council was not material and did not render the ALJ's decision contrary to the weight of all the evidence. [ECF No. 22 at 9–10]. She contends the new evidence did not indicate that left hip surgery was necessary or that Plaintiff had received additional treatment for left hip pain. *Id.* at 10–11. She maintains the evidence was cumulative of the evidence already before the ALJ and did not fill any of the gaps in the evidence noted by the ALJ. *Id.* at 11.

"If 'dissatisfied' with an ALJ decision as to entitlement to disability benefits, a claimant 'may request' that the Appeals Council review 'that action.'" *Meyer v. Astrue,* 662 F.3d 700, 704 (4th Cir. 2011), citing 20 C.F.R. § 404.967. The claimant may submit additional evidence that was not before the ALJ at the time of the hearing, along with the request for review. *Id.* at 705. However, the evidence must be both "new" and "material," and the Appeals Council is directed to consider the additional evidence "only where it relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 404.970(b). "Evidence is new 'if it is not duplicative or cumulative' and is material if there is 'a reasonable possibility that the new evidence would have changed the outcome.'" *Meyer*, 662 F.3d at 705, citing *Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991). In some cases, records dated after the ALJ's decision may still be considered to relate to the period on or before the decision. *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340–41 (4th Cir. 2012). Evidence created after an ALJ's decision should be given retrospective consideration when "'the record is not so persuasive as to rule out any linkage' of the final condition of

the claimant with his earlier symptoms." *Id.*, citing *Moore v. Finch*, 418 F.2d 1224, 1226 (4th Cir. 1969); *Johnson v. Barnhart*, 434 F.3d 650 (4th Cir. 2005).

If new and material evidence is offered and it pertains to the period on or before the date of the ALJ's hearing decision, the Appeals Council should evaluate it as part of the entire record. 20 C.F.R. § 404.970(b). After reviewing the new and material evidence and all other evidence of record, the Appeals Council will either issue its own decision or remand the claim to the ALJ if it concludes that the ALJ's "action, findings, or conclusion" was "contrary to the weight of the evidence." *Meyer*, 662 F.3d at 705, citing 20 C.F.R. § 404.970(b). However, if after considering all the evidence, the Appeals Council decides that the ALJ's actions, findings, and conclusions were supported by the weight of the evidence, the Appeals Council will deny review and is not obligated to explain its rationale. *Id.* at 705–06.

"In reviewing the Appeals Council's evaluation of new and material evidence, the touchstone of the Fourth Circuit's analysis has been whether the record, combined with the new evidence, 'provides an adequate explanation of [the Commissioner's] decision.'" *Turner v. Colvin*, No. 0:14-228-DCN, 2015 WL 751522, at *5 (D.S.C. Feb. 23, 2015), citing *Meyer*, 662 F.3d at 707 (quoting *DeLoatche v. Heckler*, 715 F.3d 148, 150 (4th Cir. 1983)). After reviewing new evidence submitted to the Appeals Council, the court should affirm the ALJ's decision to deny benefits where "substantial evidence support[ed] the ALJ's findings." *Id.*, citing *Smith v. Chater*, 99 F.3d 635, 638–39 (4th Cir. 1996). However, if a review of the record as a whole shows the new evidence supported Plaintiff's claim and was not refuted by other evidence of record, the court should reverse

1:15-cv-02275-JMC    Date Filed 03/22/16    Entry Number 23    Page 27 of 45

the ALJ's decision and find it to be unsupported by substantial evidence. *Id.*, citing *Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.3d 93, 96 (4th Cir. 1991). In *Meyer*, the court recognized that a third scenario existed—that in which the evidence was not so one-sided as to allow the court to determine, upon consideration of the record as a whole, whether substantial evidence supported the ALJ's denial of benefits. *Id.* The court found that the appropriate course of action was to remand the case for further fact finding because it was not the role of the court to assess the probative value of competing evidence. *Id.*

Here, the Appeals Council accepted the evidence that was dated after the ALJ's decision[3] and considered it as part of the record. Tr. at 2, 5. It determined that the new evidence did not provide a basis for changing the ALJ's decision. Tr. at 2. Thus, the Appeals Council accepted the evidence as new and material, but found that the ALJ's decision remained adequately supported when considered in light of the new evidence. Therefore, this court must determine whether the Appeals Council's finding was supported by substantial evidence.

Because the majority of the new evidence pertains to Plaintiff's left hip impairment, it is necessary to examine the ALJ's consideration of that impairment. The ALJ determined "left hip degenerative joint disease versus gouty arthropathy" to be among Plaintiff's severe impairments. Tr. at 25. He considered Plaintiff's left hip impairment under Listing 1.02, but determined that the evidence did not show the

---

[3] Although the February 23, 2015, MRI report is not included on the exhibit list or in the transcript, Plaintiff's attorney cited its findings in his correspondence dated March 12, 2015. *See* Tr. at 5, 303–07.

impairment to have resulted in an inability to ambulate effectively. Tr. at 26. He indicated the following regarding Plaintiff's left hip impairment:

> Claimant made only a few complaints of left hip pain after his discharge from the hospital. (Exhibits 4F, 8F, and 12F) In December 2013, orthopaedist Thomas Chambers, M.D., noted claimant to have moderately restricted range of motion in his left hip due to pain and anterior hip impingement signs. A December 2013 x-ray of claimant's left hip showed normal alignment with no fracture or dislocation. Despite these relatively benign findings, Dr. Chambers assessed claimant with left hip degenerative joint disease versus gouty arthropathy. Even so, Dr. Chambers advised claimant at this visit to continue Voltaren and noted that hip replacement may be a possibility. (Exhibit 8F) The evidence, however, does not contain imaging studies indicating the necessity for surgery, nor has claimant undergone replacement of his left hip. During claimant's February 2014 and March 2014 primary care visits, claimant was prescribed Tramadol and Meloxicam. (Exhibit 12F) Other than these primary care visits, however, claimant has not received any additional treatment for hip pain.

Tr. at 30. The ALJ found that Plaintiff's "severe impairments of the hips" in combination with his other impairments, limited him to lifting and carrying up to 20 pounds occasionally and 10 pounds frequently. Tr. at 32. He also considered Plaintiff's left hip impairment in limiting him to standing and walking for only two hours in an eight-hour workday, precluding him from climbing ladders, and restricting him to only occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling. Tr. at 32, 33.

The ALJ indicated that further standing and walking restrictions were not supported by the evidence. Tr. at 32. He noted that the evidence did not contain imaging studies that demonstrated significant abnormalities in Plaintiff's left hip. *Id.* He stated Plaintiff "did not regularly complain to his providers of having difficulty with standing or walking." *Id.* He indicated the record contained few observations of Plaintiff using a cane

and that Dr. Chambers did not suggest that Plaintiff would require the use of a cane on a permanent basis. Tr. at 33. He also cited Dr. Ritz's February 2014 observation that Plaintiff walked with a normal gait. *Id.* The ALJ further noted that Plaintiff did not regularly complain to his physicians of difficulty sitting. *Id.* The ALJ noted that the state agency physicians had indicated Plaintiff had limited abilities to push and pull with his lower extremities, but that he declined to adopt their findings "based on the relatively benign findings relating to claimant's hips." Tr. at 34.

The ALJ explained that he did not assess additional or more significant limitations, in part, based on an absence of complaints of left hip pain and abnormal imaging studies. *See* Tr. at 30, 32, 34. The evidence submitted to the Appeals Council reflected complaints of left hip pain, observations of antalgic gait and painful ROM, and an abnormal MRI. *See* Tr. at 972, 981–82, ECF No. 20-1 at 1. Thus, it contained evidence that the ALJ specifically cited as being absent from the record before him and that he suggested influenced his decision. This evidence was not so one-sided as to allow the court to determine that the ALJ's ultimate decision was unsupported. *See Meyer*, 662 F.3d at 707. Although Plaintiff endorsed significant left hip pain, demonstrated antalgic gait, and had an imaging study that showed avascular necrosis, the evidence does not indicate Plaintiff required surgery or was unable to complete work tasks with the limitations identified in the ALJ's RFC assessment. While the ALJ cited other evidence to support his decision, it is impossible for the court to determine the weight he placed on the evidence he cited as absent. Because the new evidence fills voids that the ALJ cited to support his decision, the undersigned is unable to determine whether his decision is

supported by substantial evidence. Therefore, the undersigned recommends the court remand the case to the ALJ for consideration of the new evidence.

> 2.    RFC

Plaintiff argues the ALJ did not adequately explain the RFC assessment as required by the provisions of SSR 96-8p. [ECF No. 20 at 22]. He maintains the ALJ did not consider his inability to perform fine manipulations with his hands and fingers. *Id.* at 23.

The Commissioner argues that the evidence revealed no etiology for Plaintiff's slight hand tremor and did not suggest that it imposed any significant limitation on his ability to work. [ECF No. 22 at 12]. She maintains the ALJ carefully weighed the treatment evidence, the hearing testimony, and the opinions of the treating and non-examining physicians to assess Plaintiff's RFC. *Id.*

To properly assess a claimant's RFC, the ALJ must ascertain the limitations imposed by the individual's impairments and determine his ability to perform work-related physical and mental abilities on a regular and continuing basis. SSR 96-8p. The ALJ should consider all the claimant's allegations of physical and mental limitations and restrictions, including those that result from severe and non-severe impairments. *Id.* "The RFC assessment must include a narrative discussion describing how all the relevant evidence in the case record supports each conclusion and must cite specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." *Id.* The ALJ must also consider and explain how any material inconsistencies or ambiguities in the record were resolved. *Id.* "The RFC assessment must include a

discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.* The Fourth Circuit has held that "remand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015), citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).

The ALJ found that Plaintiff had the RFC to lift and carry up to 20 pounds occasionally and 10 pounds frequently; to sit for six hours in an eight-hour workday; to stand and walk for two hours in an eight-hour workday; to occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; and to occasionally reach overhead with his left upper extremity. Tr. at 28. He determined that Plaintiff should avoid concentrated cold, heat, humidity, and fumes and must avoid climbing ladders and performing work that involved ongoing public interaction. *Id.*

The ALJ acknowledged Plaintiff's testimony that he lost strength in his left arm and developed numbness in his left hand. Tr. at 28. He discussed Plaintiff's March 2014 complaints to Dr. Ellison of numbness and tingling in the left hand and weakness in the left arm, but noted that Dr. Ellison observed him to have normal upper extremity motor strength, aside from give way weakness in the left bicep, tricep, and wrist extensor. Tr. at 30. He considered Plaintiff's allegation of loss of strength in his left arm and his history of left shoulder AC separation in limiting Plaintiff to only occasional overhead reaching with his left upper extremity. Tr. at 33.

In assessing Plaintiff's RFC, the ALJ made no specific mention of Plaintiff's ability to use his hands. He generally stated that he assessed no additional postural or manipulative limitations based on Plaintiff's assertion to Dr. Ritz that he could care for his personal needs and the absence of documentation that he needed assistance with personal care. Tr. at 33. However, the record reveals that Plaintiff complained to his medical providers of problems with his hands and that they noted abnormal findings that were consistent with Plaintiff's complaints. *See* Tr. at 862 (Dr. Ritz observed Plaintiff to have a mild tremor), 929 (Ms. Bluemle noticed that Plaintiff had reduced grip strength in his left hand and a slight tremor to his hands that was worse in his bilateral thumbs), 953 (Plaintiff complained to Dr. Ellison of pain to his left hand with numbness and tingling), 954 (Dr. Ellison observed Plaintiff to have diminished sensation to pinprick in his left hand). Dr. Ellison suggested that the pain, tremor, numbness, and tingling in Plaintiff's left hand resulted from the impairment to his cervical spine. *See* Tr. at 953 (indicating Plaintiff had occipitocervical pain to his left hand). The record contains conflicting evidence about whether Plaintiff's tremor and hand pain affected his ability to work. *Compare* Tr. at 52 (Plaintiff testified he was unable to perform his PRW because of numbness in his hands), *with* Tr. at 946 (Dr. Swartz opined that Plaintiff could use his hands for repetitive movements), 950 (Plaintiff denied numbness in his hands on September 22, 2014). While the ALJ could have reasonably concluded that Plaintiff was not limited in his ability to use his hands, his decision does not reflect that he weighed the conflicting evidence to reach that conclusion in accordance with the requirements of SSR

96-8p. Therefore, the undersigned recommends the court find that the ALJ's RFC assessment is not supported by substantial evidence.

### 3.     Medical Opinions

On October 28, 2014, Dr. Ellison indicated Plaintiff's pain was mild-to-moderate. Tr. at 970. He stated Plaintiff could work for two to four hours per day. *Id.* He indicated Plaintiff could stand for 15 minutes at a time; sit for two to four hours at a time; lift five pounds occasionally and no weight frequently; and rotate his neck to the left and right to a limited extent. *Id.*

Plaintiff argues the ALJ did not properly analyze the treating and evaluating physicians' opinions pursuant to the requirements of 20 C.F.R. § 404.1527(c) and SSRs 96-2p and 96-5p. [ECF No. 20 at 24]. He specifically maintains the ALJ cited no persuasive reasons to reject Dr. Ellison's opinion. [ECF No. 20 at 28–29].

The Commissioner argues that Plaintiff had surgery six weeks before Dr. Ellison rendered his opinion and that Dr. Ellison provided no explanation for the opinion. [ECF No. 22 at 13–14]. She maintains "[i]t was not unreasonable for the ALJ to conclude that Dr. Ellison's limitations represented Plaintiff's work capacity 6 weeks subsequent to surgery, rather than representing his ability to work for 12 months or more." *Id.* at 14.

ALJs must carefully consider medical source opinions of record. SSR 96-5p. They are required to accord controlling weight to treating physicians' opinions that are well-supported by medically-acceptable clinical and laboratory diagnostic techniques and that are not inconsistent with the other substantial evidence of record. 20 C.F.R. § 404.1527(c)(2); SSR 96-2p. If an ALJ determines that a treating physician's opinion is

not entitled to controlling weight, he is required to evaluate all the opinions of record based on the factors in 20 C.F.R. § 404.1527(c). *Id.* Those factors include (1) the examining relationship between the claimant and the medical provider; (2) the treatment relationship between the claimant and the medical provider, including the length of the treatment relationship and frequency of treatment and the nature and extent of the treatment relationship; (3) the supportability of the medical provider's opinion in his treatment records; (4) the consistency of the medical opinion with other evidence in the record; and (5) the specialization of the medical provider offering the opinion. *Johnson*, 434 F.3d at 654; 20 C.F.R. § 404.1527(c).

ALJs are also guided in weighing the relevant factors by the provisions of 20 C.F.R. § 404.1527(c). A treating source's opinion generally carries more weight than any other opinion evidence of record, even if it is not well-supported by medically-acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record. 20 C.F.R. § 404.1527(c)(2). However, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001), citing *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). Medical opinions that are adequately explained by the medical source and supported by medical signs and laboratory findings should be accorded greater weight than uncorroborated opinions. 20 C.F.R. § 404.1527(c)(3). "[T]he more consistent an opinion is with the record as a whole, the more weight the Commissioner will give it." *Stanley v. Barnhart*, 116 F. App'x 427, 429 (4th Cir. 2004), citing 20 C.F.R. § 416.927(d) (2004). Finally, medical opinions from

specialists regarding medical issues related to their particular areas of specialty should carry greater weight than opinions from physicians regarding impairments outside their areas of specialty. 20 C.F.R. § 404.1527(c)(5).

This court should not disturb the ALJ's weighing of the medical opinion evidence of record "absent some indication that the ALJ has dredged up 'specious inconsistencies,' *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992), or has not given good reason for the weight afforded a particular opinion." *Craft v. Apfel*, 164 F.3d 624 (Table), 1998 WL 702296, at *2 (4th Cir. 1998) (per curiam).

The ALJ considered Dr. Ellison's October 2014 opinion, but stated that Dr. Ellison "did not specify that these restrictions were applicable prior to surgery or that they were permanent." Tr. at 32. He indicated that Dr. Ellison's treatment notes did not document clinical findings that would preclude the performance of the lifting and carrying requirements in the RFC assessment. *Id.* He noted Dr. Ellison indicated Plaintiff was only six weeks out from surgery and that medical records did not indicate Plaintiff "would be unable to perform his assigned lifting and carrying demands for 12 continuous months following neck surgery." *Id.* He acknowledged that the record contained no post-surgical treatment notes, but observed that Dr. Ellison described Plaintiff as "doing well" and failed to mention anticipated complications. *Id.* He later stated the limitations were not supported by abnormal findings in Dr. Ellison's treatment notes prior to the September 2014 surgery. Tr. at 35.

The undersigned recommends the court find the ALJ did not adequately consider Dr. Ellison's opinion. Consistent with the requirements of 20 C.F.R. § 404.1527(c)(1),

35

(2), and (5), the ALJ considered that Dr. Ellison was an orthopedist who treated Plaintiff and performed surgery—all factors that weighed in favor of his opinion. Although the ALJ touched on the supportability factor, he failed to explain why he concluded Dr. Ellison's treatment notes did not support the restrictions he assessed. The record refutes the ALJ's conclusion that Dr. Ellison's records lacked abnormal findings. *See* Tr. at 927 (prescribing a home TENS unit for pain), 953–55 (observing tenderness to palpation, limited ROM of the neck and left shoulder, positive Spurling's sign, and diminished sensation to pinprick in the left hand and forearm; interpreting the x-rays and MRI to suggest severe cervical spondylosis that was worse at C5-6 and C6-7, but also notable at C4-5, elements of left C6 and C7 radiculopathies, and a disc herniation on the left at C5-6); 956 (discussing results of MRI and CT scans that showed severe spondylosis with significant facet joint arthrosis on the left at C3-4; spondylosis at C4-5, severe spondylosis at C5-6, with a probable left paracentral osteophyte disc complex; and severe spondylosis at C6-7, with clear osteophyte formation causing foraminal stenosis); 957 (discussing surgery, but recommending that Plaintiff pursue physical therapy first; noting that four-level ACDF would likely result in significant stiffness); 959 (observing give way weakness in Plaintiff's left biceps, triceps, and wrist extensor; diminished pinprick sensation in his left forearm and hand; depressed left brachioradialis and triceps reflexes; and left shoulder tenderness), 960 (indicating Dr. Ellison would authorize four-level ACDF surgery). While the ALJ was correct in noting that Dr. Ellison failed to specify whether the assessed limitations were applicable prior to surgery or on a permanent basis, he could have remedied the deficiency in Dr. Ellison's statement by requesting additional

information. *See* 20 C.F.R. § 404.1520b(c) ("If the evidence is consistent but we have insufficient evidence to determine whether you are disabled, or if after weighing the evidence we determine we cannot reach a conclusion about whether you are disabled, we will determine the best way to resolve the inconsistency or insufficiency. . . . We will try to resolve the inconsistency or insufficiency by taking any one or more of the actions listed in paragraphs (c)(1) through (c)(4) of this section . . . (1) We may recontact your treating physician . . . (2) We may request additional existing records. . . ."). Instead of recontacting Dr. Ellison for clarification or requesting additional records to assess Plaintiff's long-term restrictions, the ALJ speculated that the limitations pertained to the short-term, post-surgical period and gave little weight to Dr. Ellison's opinion. Because the ALJ erred in assessing the supportability factor, the undersigned recommends the court find that substantial evidence did not support his decision to accord little weight to Dr. Ellison's opinion.

4.     Credibility

Plaintiff argues the ALJ failed to properly assess his credibility. [ECF No. 20 at 30]. He maintains the ALJ did not consider the medications he was taking at the time of the hearing and their effects. *Id.* at 31–32. He contends the ALJ mischaracterized his ADLs and that the minimal ADLs he performed did not indicate he was able to engage in full time work activity. *Id.* at 32–33. Finally, he argues the ALJ did not consider his work history in assessing his credibility. *Id.* at 33.

The Commissioner argues the ALJ properly concluded that Plaintiff's ADLs were consistent with an ability to do some types of work. [ECF No. 22 at 14]. She maintains

the ALJ's observations should be given great weight because he was able to observe Plaintiff's demeanor. *Id.* She contends the ALJ's failure to consider Plaintiff's work history was harmless because he cited sufficient additional evidence to support his credibility assessment. *Id.* at 14–15.

In considering symptoms such as pain, fatigue, shortness of breath, weakness, or nervousness, the ALJ should first "consider whether there is an underlying medically determinable physical or mental impairment(s)—i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques—that could reasonably be expected to produce the individual's pain or other symptoms." SSR 96-7p. After determining that the individual has a medically-determinable impairment that could reasonably be expected to produce the alleged symptoms, the ALJ should evaluate the intensity, persistence, and limiting effects of his symptoms to determine the limitations they impose on his ability to do basic work activities. *Id.* If the individual's statements about the intensity, persistence, or limiting effects of his symptoms are not substantiated by the objective medical evidence, the ALJ must consider the individual's credibility in light of the entire case record. *Id.* The ALJ must consider "the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." *Id.* In addition to the objective medical evidence, ALJs should also consider the following when assessing the credibility of an individual's statements:

1.     The individual's ADLs;

2.     The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3.     Factors that precipitate and aggravate the symptoms;

4.     The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5.     Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6.     Any measure other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7.     Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.*

The ALJ must specify his reasons for the finding on credibility, and his reasons must be supported by the evidence in the case record. *Id.* His decision must clearly indicate the weight he accorded to the claimant's statements and the reasons for that weight. *Id.*

The ALJ found that Plaintiff's medically-determinable impairments could reasonably be expected to cause the alleged symptoms, but that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible. Tr. at 29. He found neither Plaintiff's subjective reports to his medical providers nor the medical findings were consistent with disabling limitations. *Id.* He

determined Plaintiff's medical records and ADLs were consistent with performance of the assessed RFC. *Id.*

The ALJ acknowledged Plaintiff's allegation that his medications caused drowsiness, but noted that the treatment records only contained periodic prescriptions for narcotics and other drowsiness-inducing medications. Tr. at 31–32. He also acknowledged Plaintiff's allegation of difficulty concentrating, but cited Dr. Ritz's normal findings. Tr. at 32. He noted that while Plaintiff testified to lifting only three to five pounds occasionally, he never complained to his medical providers of difficulty lifting or carrying. *Id.* He indicated Plaintiff's abilities to stand, walk, and lift as indicated in the RFC assessment were supported by his testimony that his right hip had not gotten worse since his October 2013 accident; the absence of complaints to his physicians about difficulty standing and walking; and his report that he shopped for groceries independently and drove six miles to the store. Tr. at 32, 33. He noted Plaintiff had not complained to his providers of difficulty sitting or engaging in postural activities. Tr. at 33. He stated Plaintiff had not regularly reported reduced ROM in his left upper extremity to his providers and the medical evidence documented relatively few abnormalities in his upper extremities. *Id.* He discounted Plaintiff's allegation that he had difficulty completing tasks based on his reports that he shopped for groceries, handled money, played on the computer, and watched television. Tr. at 34. He limited Plaintiff to work that did not involve ongoing public interaction, but did not assess further limitations on his ability to interact with others because Plaintiff shopped when the store was not crowded, attended church, and spent time with family. *Id.*

The ALJ neglected to discuss Plaintiff's work history as part of the credibility assessment. Plaintiff's earnings record supports his testimony that he worked for the same employer over a 14-year period. *See* Tr. at 50, 191–93. Pursuant to SSR 96-7p, the ALJ should consider statements from the claimant about his prior work record in assessing his credibility. However, a failure to discuss a claimant's work record is not a controlling factor in assessing credibility, and an ALJ's failure to discuss it is considered harmless error where he cites valid additional factors to support his credibility determination. *See Glick v. Colvin*, No. 6:12-3294-RBH, 2014 WL 994591, at *18 (D.S.C. Mar. 13, 2014). Thus, the ALJ's failure to consider Plaintiff's work history is an insufficient reason for remand in and of itself.

Here, however, the undersigned's review suggests the ALJ erred with respect to several of the reasons he cited to support his determination that Plaintiff was not fully credible. Contrary to the ALJ's assertion, the record indicates Plaintiff was prescribed narcotic pain medications throughout the relevant period. *See* Tr. at  826 (Dr. Davis prescribed Oxycodone on November 8, 2013),  823 (Dr. Reid refilled Oxycodone on November 15, 2013), 886 (Dr. Daniels discontinued Percocet and prescribed Tramadol on February 27, 2014), 948 (Marie Taylor, FNPC, prescribed Tramadol on April 29, 2014), 949 (Dr. Daniels prescribed Oxycodone on May 29, 2014, and June 19, 2014), 953 (Dr. Ellison indicated Plaintiff was taking Oxycodone HCl on July 15, 2014), 956 (Dr. Ellison indicated Plaintiff was taking Oxycodone on August 7, 2014), 951 (Dr. Swartz indicated Plaintiff was taking Oxycodone on September 22, 2014). Therefore, the ALJ

did not properly consider the type, dosage, effectiveness, and side effects of Plaintiff's medications. *See* SSR 96-7p.

As discussed in greater detail above, Plaintiff complained of problems with his left hip, and his physicians observed him to demonstrate an abnormal gait on several occasions. *See* Tr. at 817 (complained of left hip pain on November 8, 2013), 856 (complained of left hip pain on December 13, 2013), 857 (observed ambulating with limp on December 13, 2013), 885 (Dr. Daniels observed decreased left hip flexion on February 27, 2014), 929 (Ms. Bluemle observed Plaintiff to ambulate with a slow, steady gait on August 14, 2011). Because the ALJ neglected this evidence, he did not adequately consider the location, duration, frequency, and intensity of Plaintiff's pain and other symptoms. *See* SSR 96-7p.

The record also refutes the ALJ's conclusion that Plaintiff never complained of difficulties sitting or with postural activities and that his physician's failed to observe abnormal findings or reduced ROM in his upper extremities. *See* Tr. at 908 (Dr. Daniels observed decreased ROM in Plaintiff's left shoulder), 925 (Plaintiff reported severe neck pain that resulted in problems maintaining personal care, lifting and carrying, reading, sleeping, and engaging in recreation), 929 (Ms. Bluemle observed decreased strength in Plaintiff's left upper extremity and reduced grip strength in his left hand), 951 (Plaintiff complained of pain in his neck and left shoulder), 953 (Plaintiff indicated his neck pain increased in March and was accompanied by left hand numbness, tingling, swelling, and weakness; Plaintiff stated his symptoms interrupted his sleep and were worse with sitting, bending, and twisting his neck), 954 (Dr. Ellison observed limited ROM of Plaintiff's

neck and left shoulder), 960 (Dr. Ellison observed give way weakness in Plaintiff's left biceps, triceps, and wrist extensor; diminished pinprick sensation in his left forearm and hand; depressed left brachioradialis and triceps reflexes; and left shoulder tenderness). Again, the ALJ did not properly assess the location, duration, frequency, and intensity or Plaintiff's pain and other symptoms. *See* SSR 96-7p. He also neglected to consider the factors that precipitated and aggravated Plaintiff's pain and other symptoms. *Id.*

Finally, while the ALJ cited Plaintiff's ability to attend church as a reason to find that he was not as limited as he alleged, the undersigned notes that Plaintiff actually testified that he had attended church in the past, but was no longer able to attend. *See* Tr. at 53–54. Thus, the ALJ did not properly consider Plaintiff's ADLs in reducing his credibility. *See* SSR 96-7p.

Because the ALJ's other credibility findings were flawed, his error in failing to address Plaintiff's work history was not harmless. In light of the foregoing, the undersigned recommends the court find the ALJ did not adequately consider the entire record in assessing Plaintiff's credibility.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of

42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

March 22, 2016                                    Shiva V. Hodges
Columbia, South Carolina                          United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).